UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:14-CV-00384-BR

| | |
|---|---|
| ARSENIO MARTEZ RIVERS, )<br>    Plaintiff, )<br>  v. )<br>)<br>CHIEF BRIAN RHODES of the Mount )<br>Olive Police Department, individually and )<br>in his official capacity, et al., )<br>    Defendants. ) | ORDER |

This matter is before the court on the motion for summary judgment filed by defendants Brian Rhodes, Chief of Police, Mount Olive Police Department; Ian Dillard, Patrolman, Mount Olive Police Department; and Kelly Grady, Patrolman, Mount Olive Police Department. (DE # 18.) The motion has been fully briefed and is ripe for disposition.

## I. BACKGROUND

The instant dispute arises out of a traffic stop that occurred on 22 November 2013. On that day at approximately 1:12 p.m., plaintiff and his passenger, James Smith, were traveling to "Andy's," a local convenience store in Mount Olive, North Carolina. (Rivers Declr., DE # 21-11, at 1.) As plaintiff drove towards the store, Officer Dillard observed plaintiff's vehicle traveling in the opposite direction with the license plate displayed in the rear window. (Dillard Declr., DE # 18-2, at 1.) After turning around his patrol car to follow plaintiff's vehicle, Officer Dillard observed the vehicle accelerate rapidly around a curve. (Id.) Officer Dillard ascertained that the vehicle was travelling above the speed limit and, therefore, concluded that he had probable cause to initiate a traffic stop. (Id.) Plaintiff proceeded to park his vehicle in the Andy's parking lot, which Officer Dillard characterized as "a central gathering spot in a high

crime area." (Rivers Declr., DE # 21-11, at 2; Dillard Declr., DE # 18-2, at 1.) As plaintiff and Smith stepped out of the vehicle, Officer Dillard pulled up behind the vehicle and effectuated a traffic stop. (Rivers Declr., DE # 21-11, at 2; Dillard Declr., DE # 18-2, at 2.)

After making the stop, Officer Dillard approached the vehicle and instructed plaintiff and Smith to "[g]et back in the car." (Rivers Declr., DE # 21-11, at 2.) Plaintiff and Smith remained outside the vehicle, where plaintiff began to question Officer Dillard as to why he had been stopped. (Id.) In response, Officer Dillard asked plaintiff and Smith to provide their driver's licenses and the vehicle's registration. (Id.; Dillard Declr., DE # 18-2, at 2.) Smith indicated that he did not have any identification, however, he gave Officer Dillard his name. (Dillard Declr., DE # 18-2, at 2.) Meanwhile, plaintiff walked back to the vehicle to retrieve his license and registration. (Rivers Declr., DE # 21-11, at 2.) Due to the location of the traffic stop in a high-crime area, Officer Dillard called for backup while waiting for plaintiff to return with his documentation. (Id.) Plaintiff subsequently provided his documentation to Officer Dillard. (Rivers Declr., DE # 21-11, at 2.) As Officer Dillard returned to his patrol car to run the information, Smith indicated that he needed to use the restroom and walked away from the vehicle. (Id.)

At 1:15 p.m., approximately three minutes after the stop was initiated, Officer Grady arrived on the scene to provide backup. (Grady Declr., DE # 18-1, at 1.) While Officer Dillard ran plaintiff's information in his patrol car, Officer Grady approached plaintiff, who was seated in the driver's seat of the vehicle with the door ajar. (Rivers Declr., DE # 21-11, at 2-3.) Officer Grady recognized plaintiff, who had an extensive criminal history. (Grady Declr., DE # 18-1, at 1.) Officer Grady was also aware that plaintiff and Smith, who had yet to return to the vehicle, had both been arrested several weeks prior in the same vehicle, and that both guns and drugs

2

Case 5:14-cv-00384-BR   Document 23   Filed 07/02/15   Page 2 of 11

were found in the vehicle during the course of the arrest. (Id. at 2.) With this information in mind, Officer Grady asked plaintiff if there was anything in the vehicle that he should know about, to which plaintiff answered, "[n]o." (Id. at 2; Rivers Declr, DE # 21-11, at 3.) Given the location of the stop, combined with plaintiff's criminal history and Smith's disappearance, Officer Grady advised Officer Dillard to call the K-9 unit. (Grady Declr., DE # 18-1, at 2.)

Officer Dillard requested a K-9 unit come to the scene at approximately 1:20 p.m. (Dillard Declr., DE # 18-2, at 2.) Because the Mount Olive Police Department does not have the resources to maintain a K-9 unit, it relies on the Wayne County Sheriff's Office to provide these services. (Id.) The Wayne County Sheriff's Office is located in Goldsboro, North Carolina, approximately 15 miles from Mount Olive. (Id.)

While waiting for the K-9 unit to arrive from Goldsboro, Officer Dillard began to write three citations to plaintiff for driving while displaying an expired registration, driving while having registration improperly attached, and driving without proper operating equipment. (Dillard Declr., DE # 18-2, at 3.) During this time, Officer Grady continued to stand near plaintiff, who attempted to engage Officer Grady in a conversation relating to the nature of the stop and his continued detention. (Rivers Declr., DE # 21-11, at 3; Grady Declr., DE # 18-1, at 2.) Chief Brian Rhodes and two other officers with Mount Olive Police Department later arrived on the scene to provide additional backup. (Rivers Declr., DE # 21-11, at 3.) Upon the officers' arrival, plaintiff began to record the incident using his cell phone. (Id.)

During the course of the stop, several people coming and going from Andy's stopped to observe the traffic stop. (Id.; Dillard Declr., DE # 18-2, at 3; Grady Declr., DE # 18-1, at 2.) Plaintiff chatted briefly with two of the individuals who walked by the convenient store. (Rivers Declr., DE # 21-11, at 3.) Chief Rhodes and two other officers managed the evolving crowd

3

situation. (Dillard Declr., DE # 18-2, at 3.) Officer Dillard also monitored the crowd from his vehicle as he continued to write the three traffic citations. (Id.) At approximately 1:45 p.m., while Officer Dillard was writing the third citation, the K-9 unit arrived at the scene. (Id.) At this point, Smith returned to the scene and joined the crowd of people that had gathered outside of Andy's to observe the stop. (Smith Declr., DE # 21-12, at 2-3.)

As the K-9 unit began the search around the perimeter of the vehicle, Officer Grady ordered plaintiff to lean against Officer Dillard's patrol car, wherein Officer Dillard was writing the citations. (Rivers Declr, DE # 21-11, at 3.) While waiting for the dog sniff to be completed, plaintiff laid his keys on the hood of the patrol car and tapped on the hood with the palm of his hand in an effort to get Officer Dillard's attention. (Id. at 3-4.) Officer Grady then responded by shoving plaintiff in the back. (Id. at 4.)

The K-9 unit subsequently "hit" on the door handle of plaintiff's vehicle, indicating the presence of drugs. (Grady Declr., DE # 18-1, at 3.) The search of the vehicle revealed several drug-related items including marijuana seeds and stems, "roach paper," and a corner of a plastic baggy. (Id.) Following the completion of the search at approximately 2:08 p.m., Officer Dillard returned plaintiff's license and registration to him and advised him that he was free to go. (Rivers Declr., DE # 21-11, at 4; Dillard Declr., DE # 18-2, at 3.) Plaintiff was not cited or charged with any offense, other than the three traffic offenses. (Dillard Declr., DE # 18-2, at 3.) The traffic stop lasted approximately 56 minutes.

In his complaint, plaintiff alleges that the actions of Officers Dillard and Grady during the course of the traffic stop violated his Fourth Amendment right to be free from unreasonable seizures. Plaintiff also asserts an excessive force claim against Officer Grady under the Eighth Amendment and North Carolina law, alleging that Officer Grady assaulted him by shoving him

4

in the back while he waited for the dog sniff to be completed. In addition, plaintiff claims that Chief Rhodes failed to correct the purported misconduct of Officers Dillard and Grady.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012) (citations omitted). When assessing a motion for summary judgment, the court "view[s] all facts and reasonable inferences in the light most favorable to the non-moving party." Id.

"[T]he party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine [dispute] of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the movant carries this burden, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The non-moving party is not permitted to rest on conclusory allegations or denials, and "[t]he mere existence of a scintilla of evidence" will not be considered sufficient to defeat a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III. DISCUSSION

### A. Fourth Amendment Claims

The court first considers whether the facts alleged, viewed in the light most favorable to plaintiff, show that Officers Dillard and Grady violated his Fourth Amendment right to be free

5

from unreasonable seizures. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment." United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) (citing Whren v. United States, 517 U.S. 806, 809-10 (1996)).

Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest, courts evaluate the legality of a traffic stop under the Fourth Amendment by applying the two-prong test enunciated by the Supreme Court in Terry v. Ohio, 392 U.S. 1, 19-20 (1968). United States v. Green, 740 F.3d 275, 279 (4th Cir. 2014), cert. denied, 135 S. Ct. 207 (2014). Under this test, the court "consider[s] first whether the officer's actions were justified at their inception and second whether his subsequent actions were reasonably related in scope to the circumstances that justified the stop." Id.

Plaintiff challenges the stop of his vehicle under both prongs of the Terry analysis, asserting that both the stop of his vehicle and his resulting seizure violated the Fourth Amendment.

**1. Initial Stop of the Vehicle**

With regard to the first prong, plaintiff contends that Officer Dillard lacked probable cause to initiate a stop of the vehicle. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810. "Observation of any traffic violation, no matter how minor, gives an officer probable cause to stop the driver." United States v. Jones, 364 F. App'x 834, 835 (4th Cir. 2010) (citation omitted).

6

According to Officer Dillard's testimony, he observed plaintiff's vehicle with the license plate displayed in the rear window. (Dillard Declr., DE # 18-2, at 1.) Upon following the vehicle, Officer Dillard ascertained that plaintiff was speeding and, consequently, concluded that he had probable cause to initiate a traffic stop. (Id.) Plaintiff appears to concede that his license plate was displayed in the rear window of the vehicle. (Pl's. Supp. Mem., DE # 21-1, at 6.) Nevertheless, plaintiff claims that his failure to place the license plate on the bumper of the vehicle did not violate any traffic regulation and, therefore, could not provide probable cause for the traffic stop. (Id.) Plaintiff also challenges Officer Dillard's statement that he observed plaintiff speeding, asserting that Officer Dillard never mentioned to him that speeding was the basis for the stop and that Officer Dillard ultimately did not write him a citation for speeding. (Id. at 5-6.)

With regard to the placement of the license plate, North Carolina law requires that a vehicle registration plate be "attached to the rear of the motor vehicle." N.C. Gen. Stat. Ann. § 20-63(d). Plaintiff contends that the display of a license plate in the rear window sufficiently complies with the statute. However, case law does not support such an interpretation. In North Carolina v. Stone, 634 S.E.2d 244, 248 (N.C. Ct. App. 2006), the North Carolina Court of Appeals concluded that an officer had "reasonable suspicion, if not probable cause, to believe that two traffic violations had occurred[,]" where the driver had been speeding and "the vehicle's license plate was displayed in the rear window, rather than on the bumper." Subsequently, the Fourth Circuit Court of Appeals interpreted Stone as "support[ing] the conclusion that placement of the tag on the rear window, alone, constituted a violation of § 20-63(d) and provided probable cause for a traffic stop." United States v. Lucas, 322 F. App'x 326, 328 (4th Cir. 2009). In accordance with these decisions, Officer Dillard had probable cause to stop plaintiff's vehicle

7

based on his observation that plaintiff's license plate was improperly displayed in the rear window. See Whren, 517 U.S. at 810 ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Because law enforcement officials had justification to detain plaintiff's vehicle due to the license plate violation, the court need not address plaintiff's contention about speeding not providing probable cause for the stop.

### 2. Length of Detention

In addition to challenging the initial stop of the vehicle, plaintiff also claims that defendants unreasonably prolonged the duration of the traffic stop in order to conduct a dog sniff of his vehicle without reasonable suspicion that a crime other than a traffic violation had occurred or was being committed. Defendants contend that they did not impermissibly extend the duration of the stop for the purpose of waiting for the K-9 unit to arrive from a neighboring county. Alternatively, defendants argue that there was reasonable suspicion of criminal activity to detain plaintiff beyond the scope of a routine traffic stop.

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for so long as it takes to perform the traditional incidents of a routine traffic stop." Illinois v. Caballes, 543 U.S. 405, 407 (2005). "The maximum acceptable length of a traffic stop cannot be stated with mathematical precision." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). "In the context of traffic stops, police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." Digiovanni, 650 F.3d at 507 (citations omitted). During the stop, an officer may take other actions, such as conducting an exterior dog sniff of the vehicle, as long as the unrelated actions are "performed within 'the time reasonably required' to issue a traffic citation." Branch,

8

537 F.3d at 335 (quoting Caballes, 543 U.S. at 407). However, "[i]f a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent." Digiovanni, 650 F.3d at 507 (citing Branch, 537 F.3d at 336).

The facts in this case support the conclusion that plaintiff's initial detention was justified by the ordinary inquiries incident to a routine traffic stop, as well as the obstructive behavior of plaintiff and Smith and the necessary crowd-monitoring. After Officer Dillard initiated the traffic stop, plaintiff and Smith both refused to follow Officer Dillard's directive to return to the vehicle. See Branch, 537 F.3d at 336 ("[I]f the driver obstructs the police officer's efforts in any way . . . a longer traffic stop would not be unreasonable." (citation omitted)). Plaintiff and Smith eventually returned to the vehicle and provided Officer Dillard with the information he requested. However, when Officer Dillard returned to his patrol car to run the information, Smith left the vehicle and disappeared from the scene. Additionally, during the course of the stop, several individuals gathered outside of Andy's to observe the traffic stop. While Officer Dillard worked to complete the three traffic citations, "[he] was also monitoring and distracted by the evolving crowd situation near Plaintiff's car and in front of Andy's." (Dillard Declr., DE # 18-2, at 3.) At the time the K-9 unit arrived, Officer Dillard was in the process of writing the third citation. Because the entire 33-minute period from the beginning of the stop until the arrival of the K-9 unit was occupied with traffic procedures, the court concludes that defendants did not unreasonably prolong the length of the traffic stop up to that point.

Furthermore, defendants possessed additional justification for detaining plaintiff beyond that point in the form of reasonable suspicion of criminal activity. "[T]he inquiry into whether a police officer possessed a reasonable suspicion of criminal activity is properly an objective one,

9

focused solely on specific and articulable facts." Branch, 537 F.3d at 340 (internal quotation marks and citations omitted). "To satisfy the reasonable suspicion requirement, a police officer 'must simply point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" United States v. Hearns, 476 F. App'x 512, 513 (4th Cir. 2011) (quoting Branch, 537 F.3d at 336).

Here, the traffic stop occurred in a central gathering spot in a high crime area. While the location of a stop alone is not enough to generate reasonable suspicion, "[c]ontext is important" and "an area's propensity toward criminal activity" is something an officer may consider. See Branch, 537 F.3d at 338. During the course of the stop, further suspicion arose based on the evasive actions of plaintiff and Smith. When Officer Dillard initiated the traffic stop and directed the two men to return to the vehicle, neither plaintiff nor Smith complied with this directive. Officer Dillard later observed Smith leave the scene. Further, reasonable suspicion existed based on Officer Grady's communication to Officer Dillard that plaintiff had a lengthy criminal history and had recently been found to have drugs and weapons in his possession during a traffic stop involving the same passenger and vehicle. Id. (noting that an officer's knowledge that less than a month before the defendant had been pulled over in the same vehicle in an area known to be a "open air drug market" could generate reasonable suspicion). Taken together, the overall context of the traffic stop supports the conclusion that defendants had more than a hunch that criminal activity was afoot.

In summary, the court concludes that the traffic stop was not unreasonably prolonged and defendants formed a reasonable suspicion of ongoing criminal activity to justify its duration to

10

conduct a K-9 sniff. Therefore, the court finds that the traffic stop was lawful and did not violate plaintiff's Fourth Amendment right to be free from unreasonable seizures.

**B. Remaining Claims**

Plaintiff next claims that Officer Grady assaulted him by shoving him in the back in violation of his rights under the Eighth Amendment. Plaintiff also brings a claim of assault under North Carolina law. Defendants do not address these claims in their summary judgment materials. Also, they do not address plaintiff's claim that Chief Rhodes is liable for his failure to correct the purported misconduct of Officers Dillard and Grady.[1]

### III. CONCLUSION

In summary, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's claims against Officers Dillard and Grady based on the violation of his Fourth Amendment right to be free from unreasonable seizure are DISMISSED. Plaintiff's claims against Officer Grady based on excessive force and assault and against Chief Rhodes for his failure to supervise Officer Grady remain.

This 2 July 2015.

_____
W. Earl Britt
Senior U.S. District Judge

---

[1] Because the court has concluded that the stop of plaintiff's vehicle was lawful and he was not unreasonably detained, Chief Rhodes cannot be liable for any failure to correct that conduct of Officers Dillard and Grady in that regard.